| | | |
|---|---|---|
| **JUSTIN WAYNE HEATH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:19-cv-0803** |
| | ) | **Judge Aleta A. Trauger** |
| **C.R. BARD INCORPORATED and** | ) | |
| **BARD PERIPHERAL VASCULAR** | ) | |
| **INCORPORATED,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Pending are four motions related to anticipated expert testimony in this case. C.R. Bard, Inc. and Bard Peripheral Vascular, Inc. (collectively, "Bard") have filed a Motion to Strike Generic Opinions of Case-Specific Expert Lincoln Patel, M.D. (Doc. No. 49), to which Justin Wayne Heath has filed a Response (Doc. No. 79), and Bard has filed a Reply (Doc. No. 92). Bard has filed a Motion to Strike or Otherwise Exclude Certain Opinions of Derek D. Muehrcke, M.D. (Doc. No. 56), to which Heath has filed a Response (Doc. No. 71), and Bard has filed a Reply (Doc. No. 91). Heath has filed a Motion to Exclude or Limit the Expert Testimony of Glen Barnhart, M.D. (Doc. No. 62), to which Bard has filed a Response (Doc. No. 73). Finally, Heath has filed a Motion to Exclude or Limit the Expert Testimony of Christopher Morris, M.D. (Doc. No. 63), to which Bard has filed a Response (Doc. No. 80), and Heath has filed a Reply (Doc. No. 94). For the reasons set out herein, each motion will be granted in part and denied in part.

## I. BACKGROUND

Bard is a company that designs and manufactures medical devices. Heath is a Tennessean who was implanted with a Bard device, the G2 inferior vena cava ("IVC") filter. The G2 filter and

a number of other Bard IVC filters have been the subject of a great deal of litigation, including multidistrict litigation ("MDL") of which this case was formerly a part. In short, the G2 filter is a small device placed in the IVC for the purpose of intercepting blood clots before they can enter into the lungs and cause a pulmonary embolism. (*See* Doc. No. 76 ¶ 21; Doc. No. 86 ¶¶ 1, 4.) Many patients who received Bard filters have complained that their filters malfunctioned or otherwise failed to perform as hoped. Heath, who had a G2 filter installed by Dr. Mark Freeman on February 27, 2008 and whose filter came unfixed from its original installation point and migrated into his heart, is one such patient. He is suing Bard under various theories of liability for his injuries.

On November 16, 2017, Heath filed a Complaint directly with the preexisting MDL being overseen by Judge David G. Campbell in the District of Arizona. (Doc. No. 1.) On September 12, 2019, the case was transferred to this court. (Doc. No. 5.) The parties have provided expert disclosures and filed motions seeking to partially or wholly exclude the opinions of certain experts, either because those opinions are themselves inadmissible or because they violate rulings of the MDL court.

## II. LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of an expert witness' testimony at trial. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). Under Rule 702,

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

"[T]he trial judge has discretion in determining whether a proposed expert's testimony is admissible based on whether the testimony is both relevant and reliable." *Palatka v. Savage Arms, Inc.*, 535 F. App'x 448, 453 (6th Cir. 2013) (quoting *Rose v. Truck Ctrs., Inc.*, 388 F. App'x 528, 533 (6th Cir. 2010)). The court's task is to assess "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93.

The district court acts as the "gatekeeper" on opinion evidence, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997), and must exercise its gatekeeping function "with heightened care." *U.S. v. Cunningham*, 679 F.3d 355, 380 (6th Cir. 2012) (quoting *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 295 (6th Cir. 2007)). The court will not exclude expert testimony "merely because the factual bases for an expert's opinion are weak." *Andler v. Clear Channel Broad., Inc.*, 670 F.3d 717, 729 (6th Cir. 2012) (citations omitted). Indeed, rejection of expert testimony is the exception rather than the rule—the gatekeeping function established by *Daubert* was never "intended to serve as a replacement for the adversary system." *Rose v. Matrixx Initiatives, Inc.*, No. 07–2404–JPM/tmp, 2009 WL 902311, at *7 (W.D. Tenn. Mar. 31, 2009) (quoting Fed. R. Evid. 702 advisory committee's note).

Rule 702 does not "require anything approaching absolute certainty." *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671–72 (6th Cir. 2010) (citing *Daubert*, 509 U.S. at 590). Under *Daubert*, experts are "permitted wide latitude in their opinions, including those not based on firsthand knowledge, so long as the expert's opinion has a reliable basis in the knowledge and experience of the discipline." *Dilts v. United Grp. Servs., LLC*, 500 F. App'x 440, 445 (6th Cir. 2012) (quoting *Daubert*, 509 U.S. at 592) (internal quotation marks omitted). "*Daubert* and Rule 702 require only that the expert testimony be derived from inferences based on a scientific method and that those

inferences be derived from the facts of the case at hand, not that they know the answer to all the questions a case presents . . . ." *Jahn v. Equine Servs. PSC*, 233 F.3d 382, 390 (6th Cir. 2000) (emphasis and internal citation omitted). By the same token, "the 'knowledge' requirement of Rule 702 requires more than subjective belief or unsupported speculation." *Tamraz*, 620 F.3d at 670 (quoting *Daubert*, 509 U.S. at 590). Lastly, the "party proffering expert testimony must show by a preponderance of the evidence that the expert whose testimony is being offered is qualified and will testify to scientific knowledge that will assist the trier of fact in understanding and disposing of issues relevant to the case." *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000) (citing *Daubert*, 509 U.S. at 592 n.10).

## III. ANALYSIS

### A. Bard's *Daubert* Motions

#### 1. Dr. Lincoln Patel

The "MDL was formed to centralize all pretrial proceedings and complete all common fact and expert discovery concerning Bard IVC filters." (Doc. No. 3 at 9.) In order to accomplish that end, the U.S. District Court for the District Court of Arizona did not transfer this case until "[a]ll common fact discovery . . . ha[d] . . . been completed," with a few minor exceptions not relevant here. (*Id.* at 11.) The intent of the MDL court, it explained, was to make it so that "courts receiving these cases need not be concerned with facilitating general fact discovery on remand or transfer." (*Id.*) Regarding expert testimony, the MDL court had recognized that certain aspects of the opinion evidence that would be relevant to the various cases would overlap and could be accomplished *en masse* pre-remand. To that end, "[g]eneral expert discovery closed July 14, 2017," with the understanding that "case- specific expert discovery in these cases should await their remand or transfer." (*Id.* at 13.) Among the plaintiffs' general experts were Dr. Robert M. McMeeking, Dr.

Rebecca A. Betensky, and Dr. Darren R. Hurst. (Doc. No. 51-1 at 2–3, 7–8.) In light of the completion of general discovery, this court, when it entered its Initial Case Management Order, set forth deadlines for the disclosure and deposition only of "case-specific expert witnesses." (Doc. No. 29 at 5–6.)

On December 16, 2020, Heath served his Designation of Experts and Opinion Testimony on Bard. (Doc. No. 51-1.) Heath listed two case-specific physician experts: Dr. Derek Muehrcke and Dr. Lincoln R. Patel. (*Id.* at 1–2.) Dr. Patel is a "a full-time physician and fellowship-trained vascular and interventional radiologist." (Doc. No. 51-2 at 1.) In his Report, Dr. Patel discusses various aspects of Heath's case, including some matters that, Bard concedes, are appropriately within the scope of his role as a case-specific expert on the issue of causation.[1] However, Dr. Patel also makes several general statements that, Bard argues, are inappropriate for a case-specific witness. For example, he states:

> Bard continued to allow G2 to be placed in patients when internal documents report it had high incidents of migration and fracture compared to other available IVC filters.
>
> a. Design of the G2 IVC filter is flawed (modified from a known flawed design of the Recovery IVC filter) with high rates of fracture and migration.
>
> b. After 2002 when the retrievable Bard IVC filters were introduced, the vast majority of IVC filter and fragment migration causing life threatening cardiac tamponade are due to Bard IVC filters.
>
> c. Physicians were not notified of the high risk associated with placement of the G2 filter when safer alternatives were available.

(*Id.* at 2.)

---

[1] For example, Bard concedes that Dr. Patel may testify about "the etiology of [Heath's] chest pain, elevated troponin levels, and need for open heart surgery." (Doc. No. 50 at 10).

Dr. Patel's Report also includes several passages in which he merely reiterates and "adopt[s]" opinions stated by non-case-specific experts Drs. Hurst, Betensky, and McMeeking. For example, Dr. Patel writes:

> I have read the reports of Drs. McMeeking, Betensky and Hurst, and I agree with them. I adopt their opinions and bases for those opinions as a basis of my opinions set forth herein. Specifically, I adopt and rely upon Dr. McMeeking's engineering analysis of the design flaws of the G2 and Recovery filters, of Bard's misrepresentations regarding the G2 filter, and of Bard's failure to adequately test these filters; Dr. Betensky's analysis of the statistically significantly increased rate of complications of the G2 and Recovery filters, and Dr. Hurst's analysis of the history of the G2 and Recovery filters, of Bard's failure to test these filters for safety and efficacy, of Bard's misrepresentations regarding these filters, and of Bard's failure to provide physicians with information they needed and would expect to be provided when making treatment decisions (in the IFU and otherwise) and providing informed consent.

(*Id.* at 7.) He provides several additional paragraphs of summarized findings from those experts' reports that he "adopt[s]." (*Id.* at 8–9.)

Bard argues that allowing Dr. Patel to testify in this manner would (1) violate the MDL's case management orders by allowing Heath to rely on late-presented general expert testimony and (2) violate this court's Initial Case Management Order by permitting him to testify on non-case-specific issues, which that order did not contemplate or allow for. Bard argues that, if the court were to allow Dr. Patel to testify as he intends, it would not only be a technical violation of the scheduling orders but would also undermine the purposes of the MDL. *See Harris v. Wyeth, Inc.*, No. 04 CIV. 7615 NRB, 2012 WL 2317338, at *1 (S.D.N.Y. June 15, 2012) ("[T]he re-opening of discovery on the generic issues that are at the center of the action would render the more than seven years spent in the MDL Court largely for naught.").

Other courts that have received cases post-MDL have faced similar concerns and have tried to maintain the line between the testimony properly covered by the completed MDL proceedings and the case-specific testimony still needing to be considered by the trial court. For example, the

Middle District of Florida concluded that a case-specific expert in another post-MDL case against Bard could "not offer broad testimony about the sort of harm that [the relevant medical device] can allegedly cause," but was "not precluded from providing case-specific opinions that connect [the plaintiff's] injuries to the defective product." *Warren v. C. R. Bard, Inc.*, No. 8:19-CV-2657-T-60JSS, 2020 WL 1899838, at *2 (M.D. Fla. Apr. 17, 2020) (citing *Piper v. C. R. Bard, Inc.*, No. 2:16-CV-11811, 2018 WL 700798, at *2 (S.D.W. Va. Feb. 2, 2018); *Dennis v. C. R. Bard, Inc.*, No. 2:16-CV-10815, 2018 WL 691341, at *2 (S.D.W. Va. Feb. 1, 2018)).

As important as that distinction is, however, it is, to some degree, artificial. It is difficult to imagine how any physician could have an opinion about what happened with *Heath's* G2 filter that was not founded, at least in part, on the physician's opinions regarding the G2 filter *generally*, given that the filter is a mass-produced object. And, as a practical matter, it would likely only confuse the jury if a witness were to contort his testimony to create the illusion that he was offering only a strictly case-specific opinion—as if Heath's filter was some one-of-a-kind object that the witness evaluated *sui generis*. The parties, therefore, are entitled to a certain amount of leeway regarding the scope of case-specific experts' testimony.

Nevertheless, that leeway is not unlimited, and Dr. Patel's report arguably ventures far beyond the limited general opinions necessary to make his testimony clear and coherent. Heath responds that his intent is not for Dr. Patel to "offer new general expert opinions" or "supplement" the general expert opinions that the other witnesses will present. (Doc. No. 79 at 3.) Dr. Patel, however, "rel[ied], in part, on [those] general causation opinions" in crafting his case-specific opinions, and, Heath argues, Dr. Patel should be permitted to testify as such at trial. (*Id.*)

The court agrees with Heath's general argument that he is permitted to cite opinions on which he relied, although whether that argument actually supports the admission of the entirety of

the challenged opinions is another question. Dr. Patel's role, as a case-specific expert, consists, at least in part, of using his expertise to bridge the gap between other experts' general opinions and the facts of this case. *Cf. In re Bard IVC Filters Prod. Liab. Litig.*, No. CV16-0263-PHX-DGC, 2019 WL 1615080, at *1 (D. Ariz. Apr. 16, 2019) ("A primary purpose of a case-specific report is for the expert to apply his general opinions to the facts of the case. This necessarily requires the expert to reiterate or summarize some of his general opinions."). In so doing, it is appropriate for Dr. Patel to review—and testify about his reviewing of—those other experts' conclusions. *See* Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."); *see also Lampton v. C. R. Bard*, Inc., No. 4:19-CV-00734-NKL, 2020 WL 6021414, at *1 (W.D. Mo. Oct. 12, 2020) (holding that a case-specific expert is not precluded from "incorporating and relying on the general MDL discovery").

Dr. Patel can testify about his review of and reliance on other experts' opinions, but he may not independently vouch for those opinions by saying that he, based on his own expertise, agrees with them. Dr. Patel can testify, for example, that *if* a certain conclusion by another expert about the G2 filter is correct, then those facts would support the conclusion that Heath's chest pain was caused by the filter. Such an opinion would not require the relitigating of—or the improper, untimely buttressing of—the original opinion itself. However, if Dr. Patel testifies that, in his own opinion, the general expert opinion was correct, then he is doing little more than simply adding his voice to Heath's position on matters that were supposed to have been addressed prior to transfer. *See In re Bard IVC Filters Prod. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2018 WL 495188, at *3 (D. Ariz. Jan. 22, 2018) (holding that experts "will [not] be permitted at trial to simply parrot

the opinions of other experts, or to vouch for those experts, but they can rely on opinions stated by other experts").

The court, accordingly, will grant Bard's motion in part and deny it in part. Dr. Patel can testify regarding his review of the general experts' opinions and the role that those opinions played in his analysis, but he will not be permitted to testify that he agrees with those opinions in their own right or adopts them as his own opinions based on his own expertise.

### 2. Dr. Derek D. Muehrcke

#### a. Background

Dr. Muehrcke is "board-certified cardiothoracic surgeon" who has "been practicing for the past 24 years." (Doc. No. 58-1 at 2.) Dr. Muehrcke was disclosed as a general expert in the MDL, and his anticipated testimony was subject to a Motion to Exclude that was granted in part and denied in part on January 22, 2018. *In re Bard IVC Filters Prod. Liab. Litig.*, 2018 WL 495188, at *1. Bard sought the exclusion of

> seven categories of opinions: (1) Bard filters have design defects; (2) adoption of opinions of other experts; (3) reasonable expectations of physicians regarding filter performance; (4) Bard filters have an "unacceptable" risk of caudal migration; (5) Bard acted unethically in selling its filters; (6) Bard's state of mind, motive, and intent; and (7) the failure of [bellwether] Plaintiff Lisa Hyde's filter resulted in an increased risk for arrhythmias and sudden death, and the need for an implantable defibrillator.

*Id.* Although the MDL court rejected some of Bard's arguments and reserved other issues for trial, the court did make rulings limiting the admissibility of some evidence related to the first, fourth, fifth, and sixth categories. *Id.* at *2–6.

Although Bard devotes a substantial amount of briefing to arguing that this court should consider itself bound by the MDL court's conclusions in that regard, Heath, in his own briefing, does not dispute that the MDL court's rulings should continue to apply in this case, and he does

not urge this court to reconsider them. This court, accordingly, will not revisit the MDL court's rulings or engage in any analysis regarding whether this court should consider itself bound to treat those rulings as the "law of the case" in a formal sense. Rather, the court simply will apply those rulings, insofar as they were directed at the MDL as a whole rather than case-specific concerns, as still in effect, as the parties agree that this court should.[2]

Regarding the first category of potential testimony by Dr. Muehrcke that Bard sought to have excluded—testimony regarding design defects—the MDL court concluded that, "[c]learly, Dr. Muehrcke is not qualified to testify about" medical device engineering itself. *Id.* at *2. The court recognized, however, that, while Dr. Muehrcke is no medical device engineer, his expertise as a cardiothoracic surgeon does qualify him to testify regarding the effectiveness of an IVC filter's particular features in any given case:

> [Dr. Muehrcke] reviewed [bellwether plaintiff] Booker's medical records and the x-rays of her filter and, as a thoracic surgeon with years of experience in implanting and removing [IVC filters], could find no other cause for the failure of her Bard filter than inadequate migration resistance. Dr. Muehrcke is qualified to give this opinion. As a trained and experienced thoracic surgeon who regularly uses IVC filters and engages in differential diagnoses, he is qualified to opine on factors that caused a filter's failure—in this case, an inability to resist migration in the IVC. Whether he can also opine on more specific design problems such as a lack of strength and stability caused by weak anchoring hooks, lack of radial force, and inadequate leg span depends on whether his medical training and experience provide[] expertise on these specific aspects of IVC filters, something the Court cannot determine on this record.
>
> The Court will permit Dr. Muehrcke to opine that Ms. Booker's problems arose because the Bard filter's design had inadequate migration resistance. Whether he can provide more specific testimony on the cause of this inadequacy will depend on the foundation laid at trial.

*Id.* at *3.

---

[2] Insofar as any party objects that a cited portion of Judge Campbell's analysis was intended to be case-specific and should not be treated as applicable to this case, this court adopts Judge Campbell's analysis for the purposes of Heath's claims, unless otherwise indicated.

Regarding the fourth category of challenged opinions—regarding "unacceptable" failure rates—the MDL court concluded that "Dr. Muehrcke should not be permitted to opine on Bard filter failure rates," because, "[e]ven if a physician could be qualified to render such opinions, he has not conducted any study of IVC filter complication rates." *Id.* at *5. The court also concluded that Dr. Muehrcke "cannot opine that Bard filters present an 'unacceptable risk' unless that opinion is based on sufficient facts and data he has identified, to which he has applied reliable principles and methods." *Id.* (citing Fed. R. Evid 702(b)–(c)). Finally, regarding the fifth and sixth categories of challenged testimony, the court concluded that "Dr. Muehrcke will not be permitted to opine about Bard's knowledge, intent, or ethics." *Id.* at *6.

On December 16, 2020, Heath served Dr. Muehrcke's case-specific expert report on Bard. (Doc. No. 58-1.) Bard now argues that a substantial portion of that report—indeed, all but a handful of paragraphs—should be excluded as general opinions that either (1) should have been disclosed as part of the MDL and/or (2) should be excluded pursuant to the MDL court's January 22, 2018 ruling. In his Response, Heath argues that, contrary to Bard's characterization, he agrees that this court should recognize and apply the MDL court's rulings, but that Bard actually seeks to exclude a substantial amount of opinion that the MDL court affirmatively chose not to exclude.

**b. Analysis**

As a preliminary matter, the court notes that, unlike with Dr. Patel, there is no need to scrutinize Dr. Muehrcke's expert report in an attempt to excise opinions on the sole ground that they are too "general" in nature. Dr. Muehrcke was appropriately disclosed as a general expert as well as a case-specific expert, and there is no inherent harm in the fact that some of his general opinions may reappear as the background to case-specific opinions in his case-specific report. Indeed, the MDL court itself recognized that general experts who would go on to serve as case-

specific experts as well might need to restate their "general opinions in case-specific reports to provide necessary context and a basis for case-specific opinions." *In re Bard IVC Filters Prod. Liab. Litig.*, 2019 WL 1615080, at *1 (citing *Coleman v. Home Depot U.S.A., Inc.*, No. 1:15-CV-21555-UU, 2016 WL 4543120, at *1 (S.D. Fla. Mar. 21, 2016); *U.S. Fire Ins. v. Omnova Sols., Inc.*, No. 10-1085, 2012 WL 5288783, at *3 (W.D. Pa. Oct. 23, 2012)). The court, accordingly, will deny Bard's motion insofar as it seeks to strike any aspects of Dr. Muehrcke's report solely because the opinions included are too general. Similarly, the court extends its ruling regarding Dr. Patel's reliance on other experts' reports to Dr. Muehrcke; Dr. Muehrcke can testify about his review of those reports and the role that they played in his analysis, but Dr. Muehrcke cannot testify regarding the persuasiveness or veracity of any opinions other than those that directly overlap with his own.

Bard is correct that some of the highlighted portions of Dr. Muehrcke's report involve his explicitly testifying in a manner that directly contravenes the limitations imposed by the MDL court. For example, Dr. Muehrcke writes:

> What is disturbing to me as a physician who implants IVC filters [is] that Bard was aware of these risks associated with its first-generation filter, the Recovery, and its second-generation filter, the G2, that was implanted in Mr. Heath, and did not . . . provide this important information to physicians[,] all of which directly relates to the safety profile/risks associated with its IVC filters.[3]

(Doc. No. 58-1 at 9.) As Judge Campbell wrote in the MDL, the plaintiffs—including, now, Heath—have "identif[ied] no expertise that enables [Dr. Muehrcke] to opine on Bard's knowledge." *In re Bard IVC Filters Prod. Liab. Litig.*, 2018 WL 495188, at *6. As Judge Campbell wrote, "Dr. Muehrcke could opine, as a treating physician who must make decisions about IVC filter use, that Bard should have disclosed any risks it found in its products that would be

---

[3] Indeed, Bard has identified a number of such incidents in which Dr. Muehrcke makes unambiguous, affirmative statements about Bard's supposed knowledge at particular times. (*See* Doc. No. 57 at 6–7.)

unacceptable to doctors and patients." *Id.* at *5. But there is no basis for Dr. Muehrcke, who has no particular expertise regarding internal corporate decisionmaking, to offer opinions regarding what Bard knew when. The jurors can assess that evidence as well as Dr. Muehrcke can, and they have no need to hear from him on the topic.

Heath responds that Dr. Muehrcke it not *opining* on these off-limits topics, but merely *discussing the evidence* about them. (Doc. No. 71 at 8.) But if he is not opining, there is no need to discuss the issues at all. Experts are permitted to discuss factual materials they have reviewed out of court—in a manner that ordinary fact witnesses are not—only insofar as the expert actually relied on those "facts or data" in "forming an opinion." Fed. R. Evid. 703. At least some of the passages that Bard has identified are largely, if not entirely, untethered from the formation of any opinion that Dr. Muehrcke is permitted to provide. Moreover, insofar as those statements may have some loose connection to the formation of a permissible opinion, the court finds that presenting the information in a way that makes it indistinguishable from Dr. Muehrcke's own opinions would be far more prejudicial than probative. *See id.* ("But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.").

For example, in the MDL, Judge Campbell held that Dr. Muehrcke could not testify about the "'unacceptable risk' of caudal migration," even though the phrase "unacceptable risk" was taken from a "Bard internal document." *In re Bard IVC Filters Prod. Liab. Litig.*, 2018 WL 495188, at *5. Despite that ruling and despite Heath's assurances that he is not seeking reconsideration of Judge Campbell's determinations, Heath appears to be pursuing essentially the same argument here that the MDL court rejected: that testimony from Dr. Muehrcke that would otherwise be impermissible can be admitted as long as he quotes some phrase or fact from Bard's

internal documents as part of the challenged statement and claims to merely be discussing the evidence. (*See* Doc. No. 71 at 8.) Heath's argument in that regard is without merit, and, because Heath has already been admonished about this once to no avail, the court will seek to be as clear as possible: Dr. Muehrcke (or any other expert) may discuss the facts on which he relied in forming his opinion *as facts he relied on in forming his opinion*, which is permitted by Rule 703. Rule 703, however, does not grant Dr. Muehrcke license to simply testify freely in any manner he chooses, including by offering opinions that have been excluded, as long as he inserts a snippet of quoted language and hides behind Rule 703.

However, Bard has been significantly overinclusive in identifying testimony by Dr. Muehrcke that is supposedly problematic. For example, immediately following the sentence that the court has discussed—regarding how Bard's supposed knowledge of the filter's risks was "disturbing" to Dr. Muehrcke—Dr. Muehrcke opines, more circumspectly, that information regarding IVC filter safety risks "is the type of information doctors expect to be provided for several reasons[,] all of which [are] necessary for the safety of patients who are candidates for an IVC filter." (Doc. No. 58-1 at 9.) That potential testimony, unlike testimony about Bard's knowledge, would be squarely within what the MDL court held was permitted, but Bard seeks to have it excluded anyway. The court sees no ground for doing so. Similarly, the court will not strike or exclude any opinions on the sole ground that they present "new" general opinions. As the court has already discussed, the line between general and case-specific opinions in a case about interchangeable, manufactured devices is somewhat artificial, and, insofar as any of the highlighted opinions were not included in Dr. Muehrcke's original general expert report, this court finds no prejudice based on their inclusion, except in cases in which the challenged passage also

suffers from one of the other defects discussed in this section, such as having been already excluded or not being offered in support of an opinion.

That leaves the difficult task of sifting what Dr. Muehrcke will be permitted to say from what he will not. The aforementioned instances of Dr. Muehrcke's making claims about Bard's knowledge are relatively easy to identify as opinions that cannot be presented by Dr. Muehrcke at trial. Similarly, Dr. Muehrcke has included opinions regarding the "unacceptable risk" of caudal migration that were already excluded by Judge Campbell. (*See* Doc. No. 58-1 at 12.) *See In re Bard IVC Filters Prod. Liab. Litig.*, 2018 WL 495188, at *5. Those, too, will be stricken and excluded. The more difficult question is where the court should draw the line regarding what Dr. Muehrcke can and cannot say about the filter design. The court may have to enforce the details of that prohibition on a more instance-by-instance basis prior to or at trial. For now, however, the court will grant Bard's motion in part and deny it in part with regard to the portions of his opinion that are alleged to violate the MDL's rulings.

Finally, Bard identifies more traditional, *Daubert*-style objections to three aspects of Dr. Muehrcke's opinions: (1) Dr. Muehrcke's claim that all of Bard's IVC filters represent variations on the "same filter design" and that the filters were inadequately tested; (2) his testimony regarding filter failure rates and adverse event underreporting; and (3) his opinions regarding the general efficacy of IVC filters. With regard to the question of whether Bard's filters constitute the "same design," this court believes that the lines drawn by Judge Campbell on other issues can be extended to this one. Dr. Muehrcke is a qualified expert on how physicians who make treatment recommendations and decisions would have perceived Bard's IVC filters and what those physicians reasonably would have expected from Bard. As such, Dr. Muehrcke can testify that a physician would perceive the Bard filters as constituting variations on the "same design," although

he cannot opine that an engineer or medical device designer would use that term in the same way or reach the same conclusion. With regard to the testing of the Bard filters, however, Bard is correct. Dr. Muehrcke is not a qualified expert in the field of premarket medical design testing, and his opinions regarding that topic would be inappropriate to submit to the jury.

Bard has also persuasively argued that Dr. Muehrcke's report exceeds his expertise when he discusses failure rates and adverse event underreporting. For example, Bard has challenged the entirety of a paragraph, on pages 13–14 of the report, discussing Bard's communications to physicians. Dr. Muehrcke would be qualified to testify regarding how physicians would interpret those communications. Instead, however, he engages in a statistical analysis to attempt to demonstrate the alleged falsity of Bard's claims:

> [Bard] touted a low 0.153% migration-related fatality rate. It claimed their reported rate[] of migration-related fatality was below the threshold (1.0%) rates as described in the Society for Interventional Radiologist' Quality Improvement Guidelines. This was particularly misleading to doctors as the Bard results were based on the overwhelmingly underreported MAUDE database results and not on actual peer-reviewed studies. Dr. Ciavarella's report of 12/17/2004 even acknowledged that literature data (1.0% threshold) are not directly comparable to these reporting rates (0.153% MAUDE data). Resnic et al, reported that only 1 in 200 patients with complications are reported to the MAUDE database. Therefore, Bard told doctors the Recovery filter serious complication rate was 1 /200 of the correct rate. If one normalizes the Bard MAUDE complication rate by multiplying the MAUDE rate by 200, to get the correct actually reported complication rate, Bard has a fracture embolization rate similar to that reported in the peer review medical literature by Nicholson of 25%. This is well above the threshold (1.0%) rates as described in the Society for Interventional Radiologist' Quality Improvement Guidelines.

(Doc. No. 58-1 at 14.) Heath, however, has not established that Dr. Muehrcke has expertise sufficient to allow him to perform such an analysis. The court, accordingly, will grant Bard's motion as it pertains to any testimony regarding filter failure rates other than testimony regarding how a physician would interpret representations on that topic.

Finally, Bard argues that "Dr. Muehrcke's opinions regarding the efficacy of IVC filters must be excluded because they are supported by no methodology or factual support, and constitute nothing more than *ipse dixit* testimony." (Doc No. 57 at 22.) Bard has identified several instances in which Dr. Muehrcke claims that "IVC filters have never been shown to save lives by preventing pulmonary embolism," or some variation on that claim. (*See* Doc. No. 58-1 at 9, 11, 15–16.) Bard argues that Dr. Muehrcke has not provided any meaningful methodology or factual support for such a conclusion. Heath responds that Dr Muehrcke's opinion "is properly grounded in his experience, education and training as a board-certified cardiothoracic surgeon, together with his review of the medical literature on IVC filters, his review and reliance upon the reports of Plaintiff's other testifying general experts who have analyzed the available evidence . . . , and his personal experience treating patients with IVC filters." (Doc. No. 71 at 10.)

Bard is correct that a key consideration in the assessment of an expert's opinion is "whether the reasoning or methodology underlying the testimony is scientifically valid." *Daubert*, 509 U.S. at 592–93. A testifying expert must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). While there exists no "definitive checklist or test" for whether an opinion is sufficiently supported, *id.* at 150 (citation omitted), *Daubert* establishes a number of factors that typically "bear on the inquiry," including whether the theory or method in question "can be (and has been) tested," whether it "has been subjected to peer review and publication," whether it has a "known or potential rate of error," and whether the theory or technique enjoys "general acceptance" in the "relevant scientific community." *Daubert*, 509 U.S. at 593–94. However, while those "factors may be pertinent" "[i]n some cases . . . , in other cases 'the relevant

reliability concerns may focus upon personal knowledge or experience.'" *First Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 335 (6th Cir. 2001) (quoting *Kumho Tire*, 526 U.S. at 150).

Heath argues that the primary methodology that Dr. Muehrcke has employed—performing a literature review and evaluating that literature against the background of his own experience—is a well-established and acceptable methodology for rendering medical opinions of the type at issue here. The court agrees. As a practicing cardiothoracic surgeon, Dr. Muehrcke is required to assess various potential treatment options and make recommendations based on the available information about each option. That analysis would include determining whether any particular treatment has been shown to be effective. Dr. Muehrcke can testify that, in his expert opinion, the efficacy of IVC filters has not been sufficiently documented to support the decision to rely on a filter to protect a patient from pulmonary embolism. The defendants can attack that opinion on cross examination and with their own experts, but they have not demonstrated that it should be excluded. Accordingly, while the court will grant Bard's motion regarding Dr. Muehrcke in part, it will not forbid him from offering opinions regarding whether his review of the literature showed that IVC filters are effective.

## B. Heath's *Daubert* Motions

### 1. Dr. Glen Barnhart

Dr. Barnhart is a now-retired cardiothoracic surgeon whom Bard has identified as a case-specific witness in this case. He was not identified as a general witness in the MDL. Heath challenges Dr. Barnhart's ability to testify in four areas:

> (1) that the G2 filter is made of nitinol that is not thrombogenic (i.e., does not promote clot formation); (2) that . . . Heath "accepted the risks" of his filter; (3) that there is no evidence the filter "was defective or that it malfunctioned"; and (4) that . . . Heath's filter migration was caused by an increasing clot burden within the filter in combination with a distended IVC.

(Doc. No. 62-1 at 1.)

### a. Thrombogenicity of Nitinol.

In his report, Dr. Barnhart gives the opinion that "the clot found in [Heath's] right atrium was not generated by the presence of the filter lying in the right atrium or due to the filter itself" and that "it is much more likely that [Heath] experienced . . . venous thromboembolism or multiple thromboemboli that were trapped by the filter as intended," after which the filter migrated with the clot to the heart. (Doc. No. 62-2 at 6–7.) Dr. Barnhart states that nitinol, the alloy of which the filter was made, is a "non-thrombogenic material." *Id.* at 6. He explains:

> Nitinol has been found to be significantly less thrombogenic than stainless steel and has become the metal of choice for indwelling intravascular devices. Nitinol has been used for years in the human blood stream and its use continues today with the advent of transcatheter aortic valve replacement (TAVR). Over 300,000 TAVRs have been performed in the world since 2002 and remain the primary treatment of choice for many patients.

(*Id.*) Heath asks the court to exclude Dr. Barnhart's opinions regarding nitinol's thrombogenicity and the implications of that supposed lack of thrombogenicity on the likely cause of the clot in Heath's atrium.

First, Heath argues that Dr. Barnhart's opinion about the thrombogenicity of nitinol should be excluded because it is general expert opinion that should have been disclosed prior the deadline for general expert disclosures in the MDL. As the court has already discussed, the line between "general" and "specific" opinions is somewhat fuzzy in cases, such as this one, involving individuals allegedly harmed by mass-produced, interchangeable commercial products. Moreover, Heath's own briefing reveals that there are, in fact, case-specific reasons to raise the thrombogenicity issue now. As Heath writes, Dr. Barnhart's conclusions on the thrombogenicity issue are of "critical importance" to this particular case because they "form[] one of the essential grounds for Dr. Barnhart's expert opinions (1) that . . . Heath's filter migration was caused in part

by an accumulation of clots that were trapped in his filter; and (2) that . . . Heath's filter functioned as expected by catching clots." (Doc. No. 62-1 at 5.) In other words, the issue of the filter's thrombogenicity is of special, fact-specific importance in this case. The court agrees and, therefore, will not bar this aspect of Dr. Barnhart's opinion on the ground that it is inappropriate for a case-specific expert.

Heath argues next that, if the court does not find the thrombogenicity opinion to be precluded as untimely produced, it should nevertheless exclude Dr. Barnhart's testimony on that topic on the grounds that (1) he lacks the requisite qualifications to offer such a conclusion and (2) the conclusion itself is not based on sufficient facts or data. As Heath notes, Dr. Barnhart is a "cardiothoracic surgeon, not a hematologist or expert in biomaterials, and he has not disclosed any publications, training, or other qualifications that establish he has any particular expertise in the mechanisms of clot-formation, the clot-trapping potential of IVC filters, or the thrombogenic propensity of different materials or medical devices." (*Id.* at 6–7.) Heath also complains that Dr. Barnhart "does not identify any peer-reviewed published literature that he reviewed or relied upon in forming his opinion about the clot-forming potential of nitinol metal or the Bard G2 filter implanted into Mr. Heath. Instead, he relies upon his anecdotal experience with two or three patients with failed transcatheter aortic valve replacement devices." (*Id.* at 7 (emphasis omitted).)

The issues related to Dr. Barnhart's qualifications are certainly relevant to the question of how much weight his opinion should be afforded; a reasonable juror might conclude that Dr. Barnhart lacks the specialized expertise to offer a sufficiently persuasive conclusion regarding the thrombogenicity of particular materials, given that he himself is not a hematologist or an expert in biomaterial engineering. However, evaluating the risks of implantable medical devices related to cardiothoracic conditions is well within his expertise, and Dr. Barnhart can testify regarding his

understanding, from the perspective of a cardiothoracic surgeon, of the clotting risks of devices and materials that might be implanted into a patient's IVC. *See In re Cook Med., Inc., IVC Filters Mktg., Sales Pracs. & Prod. Liab. Litig.*, No. 1:14-ml-02570-RLY-TAB, 2018 WL 6538128, at *2 (S.D. Ind. Dec. 12, 2018) (holding that cardiovascular pathologist was qualified "to testify about the function of medical devices in the vascular system, how animal studies support that intended function, and whether medical devices are thrombogenic"). Regarding the materials on which Dr. Barnhart relies, the defendants argue that Heath has simply misunderstood or misstated the basis for Dr. Barnhart's opinion. For example, the defendants argue that Dr. Barnhart's opinions are, in fact, based on peer-reviewed literature, and they provide citations to the literature on which Dr. Barnhart relied.[4] (See Doc. No. 73 at 8–9.) The defendants also argue that Dr. Barnhart's opinion is based, in part, on his own significant experience with implantable medical devices. The court concludes that none of the issues that Heath has identified are sufficient to exclude Dr. Barnhart's opinions on thrombogenicity and that those issues would, rather, go to the weight of the testimony.

### b. Acceptance of Risk.

In his report, Dr. Barnhart states that, "[i]n his signing of the consent, Mr. Heath accepted the risk of migration of the filter which Dr. Freeman discussed specifically with the patient and Dr. Freeman documented in his records." (Doc. No. 62-2 at 6.) Heath objects that this is a wholly legal conclusion that will not assist the jury in resolving any contested issue of fact and is, therefore, not admissible expert opinion pursuant to Rule 702(a). *See Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 322 (6th Cir. 2014) ("[A] witness may not testify to a legal conclusion.") (citing *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994)). The court agrees. A physician

---

[4] The cited sources were, in fact, disclosed as part of the expert report as materials on which Dr. Barnhart relied, although it may not have been immediately clear, to the reader, which sources were the basis for which aspects of Dr. Barnhart's opinions. (*See* Doc. No. 62-2, attachment 2, at 10–11.) As the defendants note, Heath declined to depose Dr. Barnhart, which appears likely to have contributed to any confusion.

expert may be able to testify about certain facts relevant to a consent form—for example, whether the consent form describes risks accurately and whether the language of the form is consistent with established professional standards. Testimony expressly stating that an individual "accepted a risk," however, goes beyond any topic on which an ordinary medical expert would be qualified to opine. The court, accordingly, will grant Heath's motion in part and forbid Dr. Barnhart from testifying that Heath accepted the risk of the implantation of his filter.

### c. Lack of evidence of defect or malfunction.

Dr. Barnhart states in his report that he "f[ou]nd no evidence that the Bard G2 filter was defective or that it malfunctioned" in Heath's case. (Doc. No. 62-2 at 9.) Heath argues that testimony to that effect would be improper for largely the same reason that testimony regarding acceptance of risk would be improper—because it amounts to legal analysis in the guise of expert opinion and therefore is inadmissible pursuant to Rule 701. His briefing on this aspect of his motion, however, is relatively limited, leaving it not altogether clear where he believes the line should be drawn in rendering opinions about the supposedly defective nature of a product. It appears to the court that the substance of Dr. Barnhart's opinion is appropriate and within the scope of his expertise, with the possible caveat that, because the term "defective" has a specialized legal meaning in product liability actions, *see* Tenn. Code Ann. § 29-28-102(2), Dr. Barnhart's use of the word without expressly tying it into that definition may be confusing. Ultimately, however, the court's instructions to the jury regarding the meaning of legal terms relevant to their consideration should be sufficient to remedy any confusion, and Bard is entitled to present Dr. Barnhart's opinion on this matter. The court, accordingly, will not grant Heath's motion in this regard.

### d. Cause of filter migration.

Dr. Barnhart states, "[I]t is my opinion that the reason for migration of the filter from its documented location by plain film on August 12, 2016 to the right atrium on February 19, 2017 was the combination of an increasing clot burden within the filter [and] a distended IVC causing dislodgement and migration . . . ." (Doc. No. 62-2 at 7.) Heath argues that Dr. Barnhart does not have a sufficient basis for that opinion. Much of Heath's argument on this point is premised on the assumption that he would prevail with regard to Dr. Barnhart's thrombogenicity opinion. Because the court will allow Dr. Barnhart to testify to that opinion, he is also permitted to rely on his own analysis in offering an opinion about the potential cause of the filter migration.

Heath also faults Dr. Barnhart for suggesting that Heath suffered from a distended IVC, when his medical records supposedly show an IVC of normal size, at least at the beginning of the time period at issue in this case. The actual evidence of Heath's IVC size, however, is decidedly more complex and includes some evidence that, if credited by the jury, would undermine the assumption that the IVC was, in fact, originally of an acceptable size. This alleged flaw in Dr. Barnhart's opinion is therefore an appropriate topic for cross examination but is not sufficient for the court to exclude the analysis altogether. The court, accordingly, will not exclude Dr. Barnhart's opinion on the cause of the filter migration.

2. Dr. Christopher Morris

Dr. Morris is an "an Interventional Radiologist with 29 years of clinical experience . . . , includ[ing] the placement and retrieval of inferior vena cava filters (IVCFs), as well as the care and management of patients with IVCFs." (Doc. No. 63-2 at 2.) Bard disclosed Dr. Morris as a general expert in the MDL and as a case-specific expert in this case. Heath asks the court to exclude seven classes of case-specific opinions by Dr. Morris:

1. Opinions relating to the size of Mr. Heath's inferior vena cava and any alleged negligence by Mr. Heath's physician in selecting the filter site.

2. Opinion that Mr. Heath's injuries were exacerbated by the treatment he received after his filter migrated to his heart, including the speculative testimony that a different procedure would have had different results, and that there is a "possibility" that hemorrhagic fluid developed during the pericardiotomy performed on Mr. Heath.

3. General opinions not disclosed in MDL No. 2641, including the opinion that the nitinol used in the G2 filter design is "non-thrombogenic."

4. Opinion that if Bard G2 filter was thrombogenic, "it would not have taken nearly 9 years to develop a thrombus."

5. Opinions and statements regarding Mr. Heath's tobacco use.

6. Opinions regarding the alleged lack of follow-up of Mr. [Heath's] filter implant, and the possible outcome if it had been determined that removal of the filter was appropriate.

7. Testimony about Dr. Morris's familiarity with filter migrations in other brands of filter.

(Doc. No. 63 at 1–2.)

### a. Size of Heath's IVC (Topic 1)

In his report, Dr. Morris provides the opinion that "Heath's Bard G2 IVCF embolized/migrated to his right atrium of his heart because by 2/19/17 his inferior vena cava was too large to safely accommodate the Bard G2 IVCF and because it most likely trapped a large thromboembolus, preventing a symptomatic pulmonary embolism." (Doc. No. 63-2 at 8.) He bases his conclusion that the IVC was too large for the filter in part on a February 19, 2017 CT scan. (*Id.* at 7.) Regarding the size of Heath's IVC prior to that date, Dr. Morris writes that "we do not have an accurate way to measure the dimensions of Mr. Heath's IVC under physiologic conditions at time the filter was implanted in 2008," but "the inferior vena cava typically does not grow larger with age." (*Id.* at 8.) He notes that the physician who placed the filter, Dr. Freeman, had concluded that the IVC was an appropriate size for that filter based only on his own experience and imaging

that was of "limited quality." (*Id.* at 7.) In addition to what Dr. Morris has actually said, Heath argues that Dr. Morris's statements "*imply* that Dr. Freeman negligently placed the filter in an improper location, and further imply that the IVC was larger than the 28mm size tolerance at the time of implantation, although Dr. Morris does not explicitly state these conclusions." (Doc. No. 63-1 at 4 (emphasis in original).)

Heath objects first that Dr. Morris's testimony regarding the size of Heath's IVC is speculative and contrary to the factual record. The court addressed this issue already with regard to Dr. Barnhart. The appropriate mechanism for challenging this aspect of the experts' testimony is cross examination, not exclusion. It is simply not the case that the available evidence *so clearly resolves* the question of Heath's IVC size that no expert should even be permitted to opine to the contrary.

Heath also objects that Dr. Morris's opinions are the equivalent of testimony regarding the Tennessee standard of care, a topic on which he has not been qualified to testify. The court disagrees. Dr. Morris's testimony about IVC size is addressed to the question—central to this case and distinct from any issue about the standard of care for malpractice purposes—of how and why Heath's IVC filter migrated. Whether the size of Heath's IVC and the placement of the filter played a role in that migration is a question entirely independent of whether Dr. Freeman, who is not a defendant in this case, was negligent pursuant to Tennessee's, or any other jurisdiction's, standard of care. If Heath's filter migrated because his IVC was too big for it, then that is a relevant fact—regardless of whether the decision to place the IVC was negligent or not. Dr. Morris's report offers no opinion about the physician standard of care, and the court will not assume that he will do so, implicitly or otherwise, at trial.

Moreover, as Bard points out, Heath elected not to depose Dr. Morris, which no doubt contributed to the fact that Heath has had to target his objections so frequently to what he reads Dr. Morris to imply, as opposed to anything Dr. Morris has actually said. The court will not punish Bard for Heath's strategic decision not to seek clarification on contestable matters. The court, accordingly, will not bar Dr. Morris's testimony regarding the size of Heath's IVC.

### b. Post-implantation Care (Topics 2 and 6)

Heath identifies portions of Dr. Morris's report that, Heath argues, amount solely to criticisms of the care that Heath received after the implantation of his IVC filter. Heath argues that any such opinions should be excluded because, under Tennessee law, if Heath was injured by Bard's defective product, Bard can be held liable for resultant injuries, even if those injuries were as severe as they were because they were later "aggravated by medical treatment (either prudent or negligent)." *Howell ex rel. Williams v. Turner*, No. M2008-01588-COA-R3-CV, 2009 WL 1422982, at *4 (Tenn. Ct. App. May 21, 2009) (quoting *Transports, Inc. v. Perry*, 414 S.W.2d 1, 4 (Tenn. 1967)). As with the issue of IVC size, Bard responds that Heath is seeking to exclude material based on his surmising that Dr. Morris offered an opinion that he never offered. As Bard writes, Heath "admits in the first sentence of this section of his motion that Dr. Morris does not 'expressly stat[e]' the opinion Plaintiff seeks to exclude—that '[Heath's] injuries resulted from a failure of his treating physicians to give adequate follow-up care.'" (Doc. No. 80 at 6–7 (quoting Doc. No. 63-1 at 6).)

The lack of deposition testimony by Dr. Morris again limits the court's ability to foresee what precisely Dr. Morris will say at trial, beyond the limited statements that he has made in his report on this subject. The court, however, cannot conclude that expert testimony regarding

Heath's post-treatment care will be categorically inadmissible. Even if Heath's filter was defective from the start, his meaningful injuries did not occur until many years after the initial implantation date. Dr. Morris's testimony regarding the course of post-implantation care is therefore relevant to the jury's understanding of how those injuries came to be, and the court will not exclude any such testimony, at least at this stage, based only on the fact that Heath has read an inappropriate implication into Dr. Morris's expected testimony.

### c. General Opinions/Opinions Regarding Thrombogenicity (Topics 3 and 4)

These issues have already been addressed by the court in the context of objections to other expert witnesses' opinions. It is permissible for an expert witness to opine regarding the thrombogenicity of nitinol in the context of a case-specific opinion, and the court will not rigidly police an artificial line between "general" and "case-specific" opinions in the absence of some showing of prejudice or bad faith. The question of whether Heath's IVC filter could have caused clotting is central to Heath's own theory of the case, and, as a result, he has had ample opportunity to gather his own relevant expert testimony on the subject and chart his strategy for supporting his theory of events. And, while Dr. Morris is not a biomaterials engineer, assessing the risk of IVC filters has been a part of his practice for years, meaning that he is qualified to offer his opinion on the subject, and his lack of more subject-specific expertise will go to the weight of his testimony.

The court also will not exclude the specific opinion that, "[i]f the IVCF was prothrombogenic, it would not have taken nearly 9 years to develop a thrombus." (Doc. No. 63-2.) Heath points out that it might not have taken 9 years for a thrombus to develop and that he might have developed one long before that had simply gone undetected. That may be true, and Dr. Morris can be questioned on the topic on cross examination. Any weakness in his opinion identified by Heath, however, is insufficient to warrant exclusion.

### d. Tobacco Use (Topic 5)

Dr. Morris briefly mentions Heath's tobacco use and counseling that he received regarding tobacco cessation. Dr. Morris does not provide any opinion suggesting that Heath's tobacco use was relevant to any of the key issues of this case, and Heath objects that mentioning the tobacco use at all is an unfair and prejudicial "attempt to portray Mr. Heath as a non-compliant patient or to otherwise establish his character for unhealthy behavior." (Doc. No. 63-1.) Bard responds that Heath's tobacco use is "relevant to damages—namely, his severe coronary artery disease which necessitated urgent treatment with a coronary artery bypass graft when Plaintiff's filter was removed." (Doc. No. 80 at 14.)

Bard is correct that, insofar as Heath's tobacco use is relevant to his future expected health and life expectancy, it may be relevant to damages. Bard, however, has not identified any aspect of Dr. Morris's report that actually presents such an analysis regarding the tobacco use. This court will not permit Bard to use Dr. Morris to present potentially prejudicial facts based on its claim that the facts could be relevant to an opinion that the expert did not actually render and which was not actually timely disclosed in his report. The court, accordingly, will bar Dr. Morris from discussing Heath's tobacco use, although that will not necessarily prevent any other witness from discussing the topic if relevant.

### e. Other Brands of Filter (Topic 7)

In his report, Dr. Morris states:

> It is possible to remove a migrated IVCF in the heart percutaneously, as this procedure is well documented in the literature. I have percutaneously removed a Greenfield IVCF that migrated to the right atrium of the heart and can confirm that it is possible to safely remove an IVCF that has embolized/migrated to the heart. In my busy 30-year practice of interventional radiology practice at the University of Vermont, I have never seen a Bard IVCF that has embolized/migrated to the heart. However, I have been involved in the care of two IVCFs that have embolized/migrated, including the Greenfield IVCF within the right atrium of the

heart, as well as a Venatech IVCF that embolized/migrated through the right side of the heart and into the left pulmonary artery.

(Doc. No. 63-2 at 8 (citation omitted).) Heath objects that testimony discussing Dr. Morris's experience with migration to the atrium by other models of filter "is apparently intended to suggest the rate at which this complication occurs in Bard's filters is rare, and to exaggerate the jury's perception of the rate at which the complication occurs in other brands of filters." (Doc. No. 63-1 at 14.) Once again, Heath is objecting to something that he is reading into Dr. Morris's report, not something Dr. Morris has actually said. Dr. Morris's experience with filter removal from the atrium, moreover, is plainly relevant to the weight of his opinions regarding the retrievability of Heath's filter. The court will not bar any such testimony.

## IV. CONCLUSION

For the foregoing reasons, Bard's Motion to Strike Generic Opinions of Case-Specific Expert Lincoln Patel, M.D. (Doc. No. 49), Bard's Motion to Strike or Otherwise Exclude Certain Opinions of Derek D. Muehrcke, M.D. (Doc. No. 56), Heath's Motion to Exclude or Limit the Expert Testimony of Glen Barnhart, M.D. (Doc. No. 62), and Heath's Motion to Exclude or Limit the Expert Testimony of Christopher Morris, M.D. (Doc. No. 63) will each be granted in part and denied in part.

An appropriate Order will enter.

_____
ALETA A. TRAUGER
United States District Judge