UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JUSTIN WAYNE HEATH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 3:19-cv-0803 |
| | ) Judge Aleta A. Trauger |
| C.R. BARD INCORPORATED and | ) |
| BARD PERIPHERAL VASCULAR | ) |
| INCORPORATED, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM & ORDER

The defendants (collectively, "Bard") have filed Motion in Limine No. 1 to Exclude Testimony and Evidence of Recovery Filter Complications[1] Not Substantially Similar to the Incident at Issue (Doc. No. 130), to which plaintiff Justin Wayne Heath has filed a Response (Doc. No. 155). For the reasons set out herein, the motion will be granted in part and denied in part.

Heath is a Tennessee patient who was implanted with a Bard device, the G2 inferior vena cava ("IVC") filter, to prevent blood clots from reaching his lungs. The decision to implant the device was made after Heath developed deep vein thrombosis in the wake of gastric lap band surgery to treat his morbid obesity. Several years later, the filter came unfixed from its original installation point and migrated into his heart, causing damage and requiring surgical intervention. Heath has sued Bard, alleging that the filter was poorly designed and that Bard failed to

---

[1] The request at issue does encompass incidents related to the Recovery filter, but those are not the only incidents addressed by the request, as explained in Bard's briefing. Motion in Limine No. 1 appears to include other errors as well, such as misidentifying the filter model that Heath received. (*See* Doc. No. 130.) These errors seem likely to be the result of a clerical error related to the reuse of language from another case. The court will rely on the characterization of the underlying legal dispute in the briefing.

communicate the risks associated with the filter adequately to the medical community, including Heath's own physicians.

Bard's line of IVC filters—of which the G2 is only one—has been associated with a wide range of adverse events with varying degrees of similarity to those suffered by Heath. Bard identifies the following types of unwanted events that can occur with an IVC filter:

> [F]ilter **fracture** is defined as any loss of structural integrity (e.g., breakage of a filter arm) of the filter; filter **penetration** (a/k/a "**perforation**") is defined as filter struts extending more than 3 millimeters outside the wall of the IVC; filter **tilt** is defined as a tilt of the filter more than 15°; and filter **movement** is defined as a change in filter position compared to its deployed position more than 2 centimeters. . . . Filter movement (also referred to herein as "**migration**") can be further distinguished between "**cranial**" or "**cephalad**" migration, where the filter moves towards the patient's heart or lungs, as opposed to "**caudal**" migration, where the filter moves towards the patient's feet.

(Doc. No. 131 at 1–2 n.1 (emphasis added).) In those terms, Heath experienced cranial/cephalad migration of his G2 filter. Bard argues that Heath should therefore be limited to presenting evidence of *that* type of adverse event involving *that* type of filter and barred from presenting evidence related to either (1) cranial/cephalad migration of the G2 filter's predecessor, the Recovery filter, or (2) any adverse event involving any filter, including the G2 filter, other than a cranial/cephalad migration.

Generally speaking, a plaintiff in a products liability action is permitted to present evidence of prior incidents involving the same product, but only if those incidents were "substantially similar" to the one at issue in the case. *See Croskey v. BMW of N. Am., Inc.*, 532 F.3d 511, 518 (6th Cir. 2008) (quoting *Koloda v. Gen. Motors Parts Div., Gen. Motors Corp.*, 716 F.2d 373, 376 (6th Cir. 1983)). Substantial similarity, however, is context-dependent; what matters is not whether the events at issue share all of the same features, but whether they share enough relevant similarities that knowledge of the earlier events is likely to assist, rather than confuse or prejudice,

2

the jury. To that end, the court must look closely at the particular types of incident at issue, not merely in the abstract, but in relation to the contested issues in this case.

Cranial/Cephalad Migration of the Recovery Filter

Bard's argument that cranial/cephalad migrations of the Recovery filter are irrelevant to the risk of the same type of migration by the G2 filter is belied by the details of the relationship between the two models. By Bard's own account, there were "reports of [cranial/cephalad] migration of the entire Recovery Filter to a patient's heart resulting in death," after which Bard's design for the successor "G2 incorporated several significant design changes from the Recovery to improve fracture and migration resistance." (Doc. No. 131 at 5.) The history of Recovery filter migrations is therefore a core background fact to the story of how and why the G2 filter ended up designed the way that it was. The probative value of such information is apparent; indeed, as Bard concedes, "the MDL court did not exclude other Recovery Filter complication evidence in the bellwether trials," even though those trials, like this case, involved later Bard filter models. (Doc. No. 131 at 10 n.3.) *See In re Bard IVC Filters Prods. Liab. Litig.*, 2020 U.S. Dist. LEXIS 41911 at *307 (D. Ariz. March 6, 2020) ("[E]vidence of cephalad migrations by a Recovery filter resulting in patient death [is] necessary for the jury to understand the issues that prompted creation and design of the next-generation G2 filter, and thus [is] relevant to Plaintiff's design defect claims."). This court agrees with that approach.

Bard protests that evidence of Recovery filter migrations would nevertheless be unduly prejudicial, particularly since some of those migrations resulted in deaths caused by migrations to the heart—precisely the event that Heath suffered with his G2 filter, although Heath survived. Bard's concerns about the jury's learning of these earlier deaths are, in the view of the court, overblown. The court doubts that any limitation on the evidence could prevent the jury from

3

deducing that a small, sharp piece of metal flowing into a person's heart can, in fact, kill the person and that, therefore, a history of such migrations would likely include some deaths. IVC filters are devices that are marketed to save lives, in response to conditions that routinely end lives, and Bard has never disputed that such filters present their own risks of dangerous complications. Facts demonstrating the life-or-death stakes associated with filters are simply providing an accurate representation of the realities underlying this case, not introducing distraction or undue prejudice.

Perforations, Tilts, and Fractures

The issue of evidence related to adverse events other than cranial/cephalad migrations is somewhat more difficult. In a broad sense, all of the potential filter malfunctions discussed by the parties—cranial/cephalad migrations, caudal migrations, perforations, tilts, and fractures—share the core issue of whether Bard's filters were capable of maintaining their initial physical positioning. Bard is correct, however, that the probative value of evidence of such events becomes more questionable as the connection to Heath's migration grows more tenuous. In particular, Heath has failed to articulate a strong reason why the risk of fracture has a sufficient bearing on this case to overcome the potential prejudice that would come from the jury's hearing about the tendency of Bard filters to break into pieces. Perforations of the IVC, too, appear to have a relatively limited bearing on the particular risks that were realized here, as do tilts. Heath argues that all of these potential flaws are relevant to the question of whether Bard was a reasonably prudent manufacturer, but this case is not about whether Bard was reasonably prudent *generally*, but whether it fell short of the applicable standard of care in a way that harmed Heath. Evidence related only to the risk of fracture, IVC perforation, or tilt would have little bearing on that inquiry.

Heath objects that he should be able to present evidence related to tilts, fractures, and perforations because he will demonstrate, through expert testimony, that those events, when they

occurred, made migration more likely—meaning that a discussion of those risks would ultimately *also* be a discussion of the risk of migration itself. That argument would be persuasive if there were any evidence that the migration that Heath experienced was secondary to a tilt, perforation, or fracture. That does not, however, appear to be the case. The court recognizes that, in some past incidents, migration occurred alongside other events, and the court will not prevent Heath's experts from discussing relevant evidence of migration simply because such evidence may briefly and incidentally touch on other types of adverse events as well. Such mentions, however, should be kept to the absolute minimum and avoided whenever possible.

<u>Caudal Migration</u>

Bard's argument is far less persuasive on the issue of caudal migrations. It is true that a caudal migration is not precisely the same thing as a cranial/cephalad migration. They are, however, species of the same problem. As Heath points out, Bard's own documentation related to the G2 filter did not treat the two types of migration as wholly separate and unrelated but, rather, discussed the risk of migration generally. Both types of migration, moreover, bear on the core question of whether the filter's anchoring mechanism was capable of fixing the filter in a single spot. Indeed, there is some evidence suggesting that the design of the G2 filter may have represented something of a tradeoff between preventing cranial/cephalad migrations and preventing caudal migrations. (*See* Doc. No. 131 at 6.) The risks related to caudal migration, therefore, are relevant to the design of the mechanisms related to cranial/cephalad migration—and not necessarily only in ways detrimental to Bard's defense. The court, accordingly, will not prevent Heath from presenting evidence related to migrations, in either direction, of the G2 filter.

For the foregoing reasons, Bard's Motion in Limine No. 1 to Exclude Testimony and Evidence of Recovery Filter Complications Not Substantially Similar to the Incident at Issue (Doc.

No. 130) is hereby **GRANTED** in part and **DENIED** in part. It is **ORDERED** that Heath shall not present evidence of Bard filters' tendency to fracture, tilt, and/or perforate the IVC.

It is so **ORDERED**.

_____
ALETA A. TRAUGER
United States District Judge